FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 15, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MONICA PESINA, (01)<br>NICHOLAS SEAN CARTER, (02)<br><br>Defendants. | No.   4:19-cr-06063-SMJ-01<br>       4:19-cr-06063-SMJ-02<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS** |

On June 3, 2020, the Court heard argument on Defendant Nicholas Sean Carter's (02) Motion and Memorandum Re: Suppression of Evidence ("Motion to Suppress Evidence"), ECF No. 70, and Motion and Memorandum to Suppress Statements and Evidence ("Motion to Suppress Statements"), ECF No. 71, and Defendant Monica Pesina's (01) Notice of Joinder in Motions to Suppress ("Joinder"), ECF No. 73. Defendants moved to suppress evidence seized and statements made on June 4, 2019, when the vehicle they were traveling in was stopped by a Pasco police officer. Defendants argue the vehicle was searched without reasonable suspicion and that Defendant Carter's statements were made without having been advised of his rights and were involuntary. Defendant Pesina also moved to suppress statements she made while in custody in November 2019,

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 1

but orally withdrew the motion at the hearing.

At the conclusion of the hearing, the Court orally denied the Motion to Suppress Statements, finding Defendant Carter had been advised of his *Miranda* rights and knowingly and voluntarily waived those rights. The Court denied in part the Motion to Suppress Evidence as to evidence found in the vehicle and took under consideration the Motion to Suppress Evidence as to the legality of the traffic stop and K-9 sniff. This Order memorializes and supplements the Court's oral ruling and denies the Motion to Suppress Evidence.

## BACKGROUND

On June 4, 2019, Sergeant William Parramore with the Pasco Police Department stopped a vehicle after observing it make a turn from a stop sign without signaling for at least one hundred feet before turning. ECF No. 70-1 at 2. Captain Parramore[1] appeared at the hearing and testified. He said that he and two colleagues, Detective Corral and Detective Carlisle, were in the area and planning to meet for dinner at the Chicken Shack in Pasco. Sergeant Parramore, Detective Corral, and Detective Carlisle were members of the Pasco Police Department Street Crimes Unit, composed of one sergeant and four detectives. Captain Parramore testified that on the way to dinner, Detective Carlisle planned to stop at an address associated with Randy Rogers, an individual with an outstanding arrest warrant. Detective Carlisle

---

[1] At the time of the events at issue, Captain Parramore was Sergeant Parramore.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 2

informed Sergeant Parramore that a vehicle left the address associated with Randy Rogers, and, as Sergeant Parramore was driving to the restaurant for dinner, he happened to pull up behind that particular vehicle in a line of cars at a stop sign.

The footage from the patrol vehicle's camera reflects that the intersection was a four-way intersection—a smaller two-lane road intersecting with a larger, four-lane road—with two stop signs, one on each side of the smaller road. While waiting for the car in front to proceed, several vehicles proceeded through the intersection. Captain Parramore testified, and the police report reflects, that after the car in front pulled forward through the intersection, the vehicle pulled up to the stop sign and then activated its turn signal. *Id.* The footage shows the vehicle moved forward into the intersection as it waited for a sedan at the opposite stop sign to proceed through the intersection.

Sergeant Parramore then pulled the vehicle over and spoke with the driver, Defendant Pesina, who provided her Washington State driver's license and the car rental paperwork for the vehicle. *Id.* Also in the car were two men, one of whom, seated in the rear, was later identified as Defendant Carter. ECF No. 79-1 at 20. The vehicle footage shows Sergeant Parramore returned to his vehicle with paperwork approximately one minute after stopping the vehicle. Detective Nathan Carlisle and Detective Corral with Detective Corral's K-9 partner, Ezra, also responded to the traffic stop. *Id.* at 14, 20. The video footage from Sergeant Parramore's vehicle

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 3

reflect that approximately two minutes after Sergeant Parramore stopped the vehicle, both detectives had arrived and approached the vehicle to speak with the passengers.

Detective Corral, who also appeared and testified at the hearing, said that he recognized Defendant Pesina's name from his previous assignment as a detective with the Tri-Cities Metro Drug Task Force and DEA Task Force and knew she was suspected of being involved with drug trafficking. *Id.* at 20. Detective Corral, while Sergeant Parramore was running a driver's check of Pesina's information and reviewing the rental agreement, applied Ezra to the exterior of the vehicle. *Id.* Detective Corral declared that the application of Ezra to the vehicle "was conducted simultaneous to Sgt. Parramore conducting the driver's check and the traffic stop was not prolonged by the K9 application." *Id.* The video footage reflects that Detective Corral completed the K-9 application approximately four minutes after the vehicle had stopped, before Sergeant Parramore had returned with the paperwork.

Ezra is trained to "alert" when she first encounters odors of specific controlled substances by exhibiting a change in body posture and increased respirations. *Id.* On reaching the closest available source of the odor, Ezra will sit down or point to the location. *Id.* Ezra is trained to detect the odors of methamphetamine, crack, cocaine, and heroin, but not the odor of marijuana. *Id.* As Ezra walked around the car, she approached the rear driver's side door seam near the rear passenger and started to sniff the door seam intently. *Id.* Detective Corral testified, and the police report

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 4

reflects, that her sniffing became rapid, her mouth closed, and her tail started wagging and then she gave a final alert by sitting. *Id.* Detective Corral informed Sergeant Parramore that the dog had alerted and put Ezra back in his vehicle. *Id.* Captain Parramore testified that at that time, he believed it had become a narcotics investigation, which was not the type of work he did as a Sergeant.

Detective Corral asked the rear passenger to step out so he could speak with him. *Id.* The passenger complied, and the detective asked him to step toward the front of the car to talk. *Id.* Detective Corral then asked him if he had any weapons; Defendant Carter did not respond, and Detective Corral asked if Defendant minded if he pulled Defendant's shirt up to see if he had a firearm or weapons. *Id.* Defendant held out his arms, one of which was in a cast, and the detective pulled up his shirt. Detective Corral testified he saw a plastic bag containing a white substance sticking out of the pants pocket. The police report indicates Officer Corral believed it to be methamphetamine or cocaine. *Id.* at 21. Detective Corral indicated he had observed this and said that was why he needed to speak with him about the K-9 alert. *Id.*

Detective Corral testified that he asked if Defendant Carter had any weapons and Defendant Carter indicated he did not. However, Detective Corral asked a second time and if he had a firearm on his person. *Id.* This time Defendant Carter indicated he did. *Id.* Detective Corral placed Defendant Carter's arms behind his back and asked Sergeant Parramore for assistance. *Id.* Sergeant Parramore removed

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 5

what was determined to be a fully-loaded 9 mm pistol from the left side of Defendant Carter's pants. *Id.* Defendant identified himself and Detective Carlisle read Defendant Carter his rights from a state-issued card.[2] *Id.* Defendant Carter then admitted he was a convicted felon and that he had methamphetamine in his pocket. *Id.* Detective Carlisle placed Defendant Carter under arrest. *Id.* at 14. After he was placed into custody, the bag of methamphetamine and a syringe were removed from his pocket. *Id.* at 20.

While Detective Corral had been speaking with Defendant Carter, Detective Carlisle began speaking with Defendant Pesina. *Id.* at 14. However, when Sergeant Parramore found the handgun on Defendant Carter, he asked for Detective Carlisle to assist Detective Corral. *Id.* Detective Carlisle handcuffed Defendant Pesina and put her in the back of his patrol car. *Id.* After Defendant Carter was placed into custody, Detective Corral then went to question Defendant Pesina. *Id.* at 20. He advised her of her rights and asked if she agreed to speak to him and listen to his question and she agreed to listen. *Id.* He asked if there were more drugs in the car and she initially said no but refused to answer when the question was repeated. *Id.*

The car was seized as evidence and was towed to a garage, where Detective

---

[2] Detective Corral's bodycam video footage of the encounter reflects Detective Carlisle first asked Defendant whether he was a felon, but then without giving him a chance to answer, asked Detective Corral if he had read Defendant his rights. When Detective Corral said he had not, Detective Carlisle then read Defendant his rights and asked again whether Defendant was a felon.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 6

Corral observed an undetermined amount of money in the center console of the vehicle. *Id.* After obtaining a warrant to search the car, the officers found 41 bullets and a backpack in the trunk with about 372 grams of purported methamphetamine, about 55 grams of purported heroin, and $26,950 in cash, as well as a digital scale and several empty Ziploc baggies. *Id.* at 16. Defendant Carter asserts a traffic citation was issued as to Defendant Pesina, but the citation was dismissed.[3] ECF No. 70 at 3.

A criminal complaint was filed against Defendant Pesina on October 22, 2019 and an indictment was filed against both Defendants on November 6, 2019. ECF Nos. 1, 6. Defendant Carter is charged with possession with intent to distribute 5 grams or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii), possession of a firearm in furtherance of drug trafficking in violation of 21 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). ECF No. 5. Defendant Pesina is charged with possession with intent to distribute 50 kilograms or more of actual methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), and possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

---

[3] Defendant Carter asserted the citation was dismissed for lack of probable cause. ECF No. 70 at 3. However, the record of the citation that Defendant Carter submitted reflect only that the citation was dismissed on a motion from the City. Ex. 2001, 2002.

# LEGAL STANDARD

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A police officer may stop a vehicle if there is probable cause to believe a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806, 810 (1996). Further, without probable cause, a warrantless arrest is unlawful. *United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2004) (citing *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999)). In order to be admissible in evidence, a defendant's statements must be the product of a voluntary, knowing, and intelligent waiver of the defendant's Miranda rights *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

# DISCUSSION

**A.    Request to recuse**

During the course of testimony, the undersigned stated that he previously represented Randy Rogers, the person for whom there was an outstanding arrest warrant mentioned as background to the vehicle stop. The undersigned represented Mr. Rogers in 2008, approximately twelve years ago, when acting as a defense attorney. Defendant Pesina asked that the Court recuse itself, both on the basis of the undersigned's prior representation of Mr. Rogers and the fact that the undersigned presided over the trial of Defendant Pesina's brother. The Court denied the request, finding that the undersigned did not have a conflict.

B.  **There was probable cause to conduct the traffic stop**

Because traffic stops are equivalent to pedestrian encounters, the same objective "reasonable suspicion" standard applies. *United States v. Choudhry*, 46 F.3d 1097, 100 (9th Cir. 2006). As with a *Terry* stop, the reasonable suspicion for a traffic stop is based on the totality of the circumstances. *Id.* (citing *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

On January 17, 2019, the Court of Appeals of Washington, Division Three issued a decision in *State v. Brown* holding that the continuous use of a turn signal during the last one hundred feet prior to a turn under Wash. Rev. Code § 46.61.305(2) is only required when public safety is implicated. 432 P.3d 1241, 1248 (Wash. Ct. App. 2019). However, if a left- or right-hand turn can be made safely without the use of a signal, no signal is required. *Id.* The Supreme Court of Washington overturned this decision on December 26, 2019, holding that statute set forth two separate requirements: the safe movement of the vehicle and the appropriate use of a turn signal. *State v. Brown*, 454 P.3d 870, 872 (Wash. 2019). The statute's language regarding continuously signaling set forth the requirements for appropriately using a turn signal. *Id.*

At the time of this traffic stop, the rule announced in January 2019 by the appellate court was in effect. However, the circumstances in *Brown* are distinct from the circumstances in this case. In *Brown*, a driver used a designated left-hand

1  turn lane to travel from one road onto a highway. *Brown*, 432 P.3d at 1249. There
2  were no other vehicles on the roadway except for the state trooper, who was
3  following behind the defendant. *Id.* The court found that the defendant's "execution
4  of a turn without signaling caused no possible concern for public safety" and thus,
5  did not violate the terms of Wash. Rev. Code § 46.61.305(2). *Id.*

6  Here, the footage from Sergeant Parramore's patrol car shows Defendant
7  Pesina pulled up to a stop sign at an intersection where the cross traffic did not stop.
8  While she was waiting for the vehicle in front of her to turn left, six vehicles
9  proceeded through the intersection travelling on the four-lane road. Another two cars
10 turned left onto the road where Defendant Pesina was waiting to turn. After the
11 vehicle in front turned left, Defendant Pesina pulled up to the stop sign and turned
12 on her blinker. At almost the same time, a white or silver sedan on the other side of
13 the intersection, also waiting at a stop sign, proceeded forward. Defendant Pesina
14 also proceeded forward a few feet into the intersection while the sedan was still
15 traveling through the intersection. Thus, Defendant Pesina's actions did cause
16 possible concern for public safety and Officer Parramore's observations supported
17 reasonable suspicion that Defendant Pesina had committed a traffic violation.

18 **C.     The K-9 application did not infringe on Fourth Amendment rights**

19 "During a traffic stop, a police officer is allowed to ask questions that are
20 reasonably related in scope to the justification for his initiation of contact." *United*

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 10

*States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001) (citing *United States v. Baron*, 94 F.3d 1312, 1319 (9th Cir. 1996)). A valid traffic stop "can become unlawful if it is prolonged beyond the time reasonable required to complete [the] mission [of issuing a ticket]." *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). However, a period of detention may be "permissibly extended because new grounds for suspicion of criminal activity continue[] to unfold." *United States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005).

"An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop" but he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Typically, the ordinary inquiries incident to a traffic stop "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citing *Delaware v. Prouse*, 440 U. S. 648, 658–60 (1979)).

However, "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Caballes*, 543 U.S. at 409 (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). The application of a dog trained in drug detection to the exterior of the vehicle, as long as it does not "expose noncontraband items that otherwise would remain hidden

from public view," during the course of a traffic stop, generally does not implicate a legitimate privacy interest. *Id.* (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)).

The video footage of events shows Ezra's walk around the vehicle did not expose any contraband that would have otherwise remain hidden. Detective Corral testified that the sniff occurred while Sergeant Parramore was checking on the driver and rental agreement information. The police report also indicates the application of Ezra to the vehicle "was conducted simultaneous to Sgt. Parramore conducting the driver's check and the traffic stop was not prolonged by the K9 application." *Id.* at 20. Moreover, the video footage from Sergeant Parramore's body camera reflects that he was, indeed, processing these documents at the time.[4] Sergeant Parramore testified that checking the driver's identification against databases and reviewing the rental agreement were standard procedure for traffic stops.

---

[4] Sergeant Parramore's body camera footage did reflect that he briefly picked up his cell phone and sent a text message. He was asked about this at the hearing and testified that it was a personal text message and that he did not remember what it was about or to whom he sent it. In reviewing the footage, it appears that approximately sixteen seconds passed in the time it took to pick up the cell phone, send the text message, and return to reviewing the documents. This sixteen-second delay while conducting the investigation incident to the traffic stop does not arise to the level of a constitutional violation. *See United States v. Turvin*, 517 F.3d 1097, 1103 (9th Cir. 2008) (finding brief pause while writing ticket was not unreasonable).

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 12

The Court questions the credibility of the officers' testimony that they were not targeting this particular vehicle and had no pre-arranged agreement regarding conducting the K-9 sniff. The officers' version of events involves many coincidences: (1) Detective Carlisle stopped at a residence on the way to dinner and saw a vehicle leaving, (2) Sergeant Parramore then happened to come upon the vehicle that had left the residence, (3) Detective Carlisle and Detective Corral with Ezra all regularly arrive at routine traffic stops to back up other team members, (4) Detective Corral and Detective Carlisle were both near enough to arrive within approximately two minutes, and (5) Detective Corral recognized Defendant Pesina's name and associated it with his experience on a drug task force.

However, even rejecting this narrative and assuming these officers targeted Defendants' vehicle and that the traffic stop was a pretext to further that objective, the Court can find no constitutional violation. Sergeant Parramore observed Defendant Pesina commit a traffic infraction and so had reasonable suspicion to stop the vehicle for that infraction, even if the violation was merely pretextual. *See Whren*, 517 U.S. at 817–19 (holding traffic stop based on probable cause or reasonable suspicion valid even where the stop was a pretext). Detective Corral did not need reasonable suspicion to apply Ezra to the vehicle. *See Caballes*, 543 U.S. at 409. And Detectives Corral and Carlisle acted with such alacrity, bordering on tactical precision, that the dog sniff did not extend the traffic stop in any way.

*Cf. Rodriguez*, 575 U.S. at 355. As such, the K-9 sniff did not violate Defendants' Fourth Amendment rights and the Motion to Suppress Evidence the K-9 sniff is denied.

**D.  The officers had reasonable suspicion to detain Defendants after the alert**

To justify conducting an investigatory stop, the officer must be able to point to specific, articulable facts, which taken together with rational inferences from those facts, form the basis for suspecting that the particular person detained engaged in criminal activity. *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir. 2001) (citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). This "reasonable suspicion" necessary to justify such a stop depends "upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). An "alert" by a "certified, reliable narcotics dog [is] sufficient, even by itself, to support a finding of probable cause" for an arrest. *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003) (citing *United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993)).

Detective Corral knew of Ezra's reliability, and so her alert to the presence of controlled substances supported probable cause for an arrest as well as reasonable suspicion to support continuing to detain Defendants. *See White*, 496 U.S. at 330. Thus, the Court finds the continuing detention of Defendants was not a Fourth Amendment violation.

ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENTS – 14

### E. There was probable cause to support the search warrant

"Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference to a magistrate's determination." *See United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1069)). The Fourth Amendment permits a defendant to challenge the validity of a warrant only if the "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155 (1978). To justify a *Franks* hearing, Defendant must meet both the state of mind and materiality elements. *Id.* "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. Further, "[a] canine sniff alone can supply the probable cause necessary for issuing a search warrant if the application for the warrant establishes the dog's reliability." *Lingenfelter*, 997 F.2d at 639.

Defendants do not allege that the officers made false statements or omissions in their affidavits and thus Defendants cannot show they are entitled to a hearing

under *Franks*, 438 U.S. at 155. The Court gives great deference to the determination of the judge who signed the warrant that probable cause existed to issue the warrant to search the vehicle. Further, the application for the search warrant included Ezra's resume and certification and indicated that she had alerted for the presence of controlled substances. ECF No. 79-3 at 23–24. Thus, there was probable cause to support the warrant even without any additional evidence and the Motion to Suppress Evidence is denied on this basis.

### F. Defendant Carter was properly given a *Miranda* warning

In order to be admissible in evidence, a defendant's statements must be the product of a voluntary, knowing, and intelligent waiver of the defendant's Miranda rights:

> [T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Voluntariness" and "knowing and intelligent" are two distinct considerations to be analyzed separately in determining whether a Miranda waiver was valid. *Colorado v. Spring*, 479 U.S. 564 (1987). "[I]n at least some cases waiver can be clearly inferred from the actions and words

of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

Detective Corral's body camera footage shows that Defendant Carter and Defendant Pesina were advised of their rights before answering officers' questions. Their conduct in answering the officer's questions after having been informed of their rights shows that they waived those rights. *Butler*, 441 U.S. at 373. Defendant Carter argues the fact that he was detained at the time of his waiver renders the waiver of his rights invalid. However, Defendant Carter points to no case law in support of his position and the Court cannot infer from the mere fact that Defendant Carter was—lawfully—detained that his waiver was *per se* involuntary. The Court has reviewed the video of Defendant Carter's statements after being given a notice of his rights and cannot identify any circumstances that would render his waiver involuntary. As such, the Motion to Suppress Statements is denied.

## CONCLUSION

Defendants have not shown a Fourth Amendment violation. They were stopped by an officer with a reasonable suspicion that the vehicle's driver had committed a traffic violation because he personally observed the violation occur. The K-9 application was limited to the exterior of the vehicle and did not prolong the traffic stop. Only after the K-9 alerted to the presence of narcotics did the officers extend the traffic stop. Further, the positive K-9 alert alone supports probable cause that justified detaining Defendants and also supported the warrant to search the

vehicle. Defendant Carter was informed of his rights and knowingly and voluntarily waived those rights. As such, both motions are denied as to both Defendants.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant Carter's Motion to Suppress Evidence, **ECF No. 70**, as joined by Defendant Pesina, **ECF No. 73**, is **DENIED**.

2. Defendant Carter's Motion to Suppress Statements, **ECF No. 71**, as joined by Defendant Pesina, **ECF No. 73**, is **DENIED**.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel, the U.S. Probation Office, and the U.S. Marshals Service.

**DATED** this 15th day of June 2020.

_____
SALVADOR MENDOZA, JR.
United States District Judge